Just out of curiosity, two days ago when President Bush created a monument that seems to be on your atoll, does it kind of move a lot of this? No, Your Honor, it doesn't. And I'm glad you mentioned that. I'm just curious. After, of course, introducing myself, Michael Johnson, for the plaintiffs' appellants, and saying, hey, please decor, my first observation is, isn't it nice to be thinking about a Pacific island on a cold winter day in Washington like this? And secondly, isn't it timely, given what President Bush did yesterday, essentially? The contrast between the Wildlife Refuge designation at issue in this case and the National Monument designation President Bush just proclaimed is telling, and it's extreme. The Wildlife Refuge designation in this case was targeted at one small island that extends only 12 miles out. The government was on notice that there was a single commercial enterprise operating on that island, and the government knew that the purpose of the enterprise was to engage in commercial fishing activity in the waters surrounding the island. What exactly has the government – what has the government prevented you from doing? There's some murkiness in the materials before us, and I want to be sure that I understand exactly what you want to do and can't do. Certainly, Your Honor. The executive order designating the waters surrounding Palmyra as a wildlife refuge expressly states that commercial fishing is prohibited. In the area? Yes. How far out? To 12 miles. 12 miles. And you want to fish in that area? No, Your Honor. No, okay. Another section of the regulation states that the refuge waters will be protected from commercial fishing activity. That's something different. It must be broader. The Secretary used different words. He must have had something else in mind. And what do you think that entails? It entails any activity that's related to plaintiff's commercial fishing operation. It means you think you can't catch a fish driving in Palmyra? The plain text of the regulation says the waters will be protected from commercial fishing activity. The scope of the refuge extends from the very water's edge – the very water's edge – out 12 miles. That means the harbor, the dock, those are all covered. In those areas, commercial fishing activity is functionally prohibited. Well, now, in the government's brief in footnote A, they say that the regulation bars commercial fishing but not commercial fishing vessels. Now, if that's their position, where's the injury to you? Your Honor, that's the government's position, but it's not consistent with the plain language of the regulation. Well, would you be happy if we held the government to that position? No, Your Honor, because – What do you lose if you're entitled to traverse the 12 miles? The ability to engage in activity at the dock. One need not only have the vessel able to traverse the ocean. One must be able to engage in activities to get material from the boat to the base. Are you fishing from the dock? No, Your Honor. So what are you doing at the dock? Onloading, offloading the catch, maintaining – Are you prevented from doing that by the regulation? Yes, Your Honor, that's what the plain language of the regulation reads. Has the government prevented you from doing that at the dock? Well – They issued an order saying you can't unload your boat at the dock. Well, that's what the regulation says. They issued an order saying you can't unload your boat at the dock. No, because it's not necessary. The regulation says that. I guess we don't agree with you so far is what we're saying. And the government doesn't even seem to agree with you. And so we're all sort of scratching our heads saying if nobody thinks there's a problem, under the language of this regulation, for them to drive their boats to the dock, unload their fish, use the airstrip, that the only restriction seems to be catching fish within a 12-mile radius, which, of course, you could never have gotten from a licensee because he doesn't own the water. We're kind of all scratching our heads saying the government seems to be conceding that you can do these things, so why aren't you taking this concession and, you know, driving the boat over it? The government's not making those concessions, Your Honor. They're saying vessels might be able to traverse the 12 miles, but there's nothing in their brief. They made no statement to the trial court. There's certainly been no factual finding here, and it's plainly in dispute whether commercial fishing activity at the dock and harbor could take place. For a commercial fishing vessel to come to the dock and unload its catch, it seems quite consistent to me with the plain language of the term commercial fishing activity, that unloading, offloading, maintaining the vessels in that area is commercial fishing activity, and that's exactly what the regulation says the Secretary of Interior shall protect the refuge waters from. Refuge waters, but activities on the land are not within the scope of the regulation, as I understand it. Is that correct? The emergent land, but the emergent land is the land above the high-water line, so as the vessels are sitting in the water, they are in the refuge. The government specifically cited to the trial court a statute called— to use a dock if they don't own the water that the dock sits on. I'm wondering about how you could have obtained a contractual right to something that they didn't own. Well, that may be a part of the contract that's not enforceable here, but the licensor did give us valuable rights to use parts of the emergent land, the base camp and the airstrip. But there's nothing in the regulation that says that that is somehow prohibited. Well, it's not prohibited, but it's totally nullified, because if you can't offload the catch at the dock, there's absolutely no commercial value to having a contract. But, well, that kind of goes to say, suppose the government had said you can't fish within 100 miles of the Atoll, you'd be saying, well, we're practically well on 100, we should circle 1,000 wide. So if they said you can't fish within 500 miles, you know, you couldn't argue to us that that somehow took away your right to use the dock or the airstrip. Well, Your Honor, we need to look at the targeting analysis, because the three critical errors that the trial court made are first, holding that frustration was the correct theory, that because the government didn't step into plaintiff's shoes, there couldn't have been a taking of the contract here. That's just entirely inconsistent with this court's holding in United Nuclear. In United Nuclear, the plaintiff was a mining company that had a mineral lease with an Indian tribe. The government essentially nullified that contract by failing to approve the mining plan at the behest of the Indian tribe. The government didn't begin mining on its own account. The government frustrated the mining company's contract. That was held to be a taking. The trial court in that case engaged in exactly the same analysis that the trial court engaged in in this case. But, Mr. Johnson, I don't quite understand how the government has frustrated your ability to perform under your leasing arrangements for your fishing operation. The only restriction, it seems to me, under the regulations would be prevention from fishing within the 12-mile window. Everything else that you're performing can be performed. Unless the government essentially ordered you not to do it. Your Honor, my original question still remains. If they ordered you not to do it, not to perform under the lease, are there any actions that you can take under the lease? Your Honor, I'm not sure I can add much to what I said earlier, which is the plain language of the regulation covers commercial fishing activity. And in order to make use of the contract rights, commercial fishing activity had to take place in the refuge because the refuge covers all the water at the dock. I'm sure you're a much better lawyer than that. I think you can probably issue an opinion on that basis that the regulation is restricted. I'm sorry, Your Honor. Does that prevent you from conducting anything but actual fishing operations within the 12-mile window? No, Your Honor, because there are two pieces of the regulation here. There is one sentence that prohibits commercial fishing. There is a separate sentence that addresses commercial fishing activity. Just as an ordinary rule of statutory construction, those two terms must mean different things because they use different words. The protection from commercial fishing activity must cover a broader range of functions than the flat-out prohibition on commercial fishing. Otherwise, if the Secretary had meant those two things to mean the same, he would have used the same words. He didn't. He meant to extend something beyond just commercial fishing in the refuge waters. That's why he used separate words. What is exactly the nature of—we've talked about the license that you have to operate a commercial fishing operation. Is it a license when we've referred to lease? What is the nature of the property right that you have? It's a very important question, Your Honor. This case is about a contract. It's not about a fishing license. This is not Conti. This is not American Pelagic, where the question was, does the right to fish in an EEC constitute a property interest? Plaintiff had a contract. But does the contract constitute the conveyance of the lease contract, or did it constitute simply a contractual arrangement between two parties in which one is obliged to engage in certain activities on the other party's property? Well, I'm not sure there's a difference between those two things, Your Honor. Well, I think so. I think so. Property laws—a few hundred years of property law, and they think it's very important. Well— I mean, if I say to you that you can come over to my house and from time to time can use my table saw to do woodworking, I have not granted you a lease. Certainly, Your Honor. But if, as is the case in the facts of the issue here, you say, I own a parcel of property. You have the exclusive right to occupy it and to use it, that starts to look much more like a lease. Well, but that's my question. Is this, in your view, a lease, or is it a contractual arrangement under which one party is entitled to engage in certain activities on a parcel of land that remains in the other party in terms of its real property enjoyment? Well, Your Honor, functionally, it is a lease. We made that point in our brief. There is no distinction functionally between plaintiff's interests here, which are the right to use land for a particular purpose, a particular parcel, and the mineral lease addition in the United Nuclear, which, of course, didn't give the mining company fee simple or title to the land. And plaintiffs here don't claim they had title to the land. They claim they had an interest and ability to use the land for a purpose that was commercially valuable, the ability to get fish to market more quickly, more efficiently, in better condition, and therefore more profitably than their competitors. How much of the land did your lease entail? The base camp is relatively small. I believe it's in the record. I don't have the facts in my head. It entails, you say, a temporary ownership interest in a chunk of Elmira. It's a usurpatory right, Your Honor. It's not a fee simple interest. I don't want to get up on you, but it's a right to occupy. A right to interest isn't a fee simple, but it's a property interest for the period of. . . The exclusive right to use the base camp, the exclusive right to use the airstrip for certain purposes. Now, the base camp was some number of acres or portions of an acre, but it's a significant piece of the atoll. Nobody else can use the airstrip. Others can use the airstrip, but not for any commercial fishing activity. It's an exclusive right to use the base camp at all. Okay, I don't want to hold you up on this. Go ahead. So, Your Honor, the first error was in holding that frustration cannot be a taking, and this gets to Judge Gahars' point. The government did not have to come in and negate the contract by nullifying the entire value of the contract. That is a frustration. Frustration and takings are not mutually exclusive. The salient point is here there was targeting. Where there is targeting, there can be a taking, even though there's only a frustration. That's the holding of United Nuclear Commerce. The trial courts also heard . . . So are you saying it doesn't have to be nullified? Well, Your Honor . . . It just has to be frustrated. Your Honor, it seems to me that in this instance the contract was both frustrated and nullified. There was no way for the plaintiffs to make any economic use of their contract rights to use the island for this purpose of operating a commercial fishing base. I see them in the . . . Well, that's all right. This is a difficult case, so we'll give you some extra time. Thank you, Your Honor. The trial court also incorrectly concluded that while the government action in Siena Gardens was targeted at the contract rights not only in motivation but also in structure and form, this case was different. The trial court held that the structure and form of the wildlife refuge designation was not targeted at the plaintiffs. Your Honors, that was incorrect, especially to hold on a motion to dismiss. The wildlife refuge designation was in structure and form aimed at the plaintiffs' contract rights, and here's how we can establish that. The Department of Interior had full knowledge that plaintiffs had a contract to operate a commercial fishing enterprise on Palmyra, and with that knowledge, the Department of Interior drafted, very carefully drafted, the regulation that negated the contract. How do we know there was full knowledge that a plaintiff was the sole and exclusive operator of a commercial fishing enterprise on Palmyra? We know that from the e-mails that we submitted in the record. Let me give you an example. You've laid this argument out well in your brief, and I think you understand it, but let me put to you a question that seems to me to be, I see it, to be a form of targeting, if you will, but nonetheless, requiring whether the government is fully entitled to do it. Suppose I have a house which is in an area adjacent to a national forest in West Virginia, let's say. For years, the national government just allowed people to engage in logging in the national forest, either with or without paying a fee. Now, I make a contract with you. You want to do logging, so I make a contract with you saying, you can use my house for logging, and you say, that's great. I expect that I'll continue to be able to log in the national forest. But two days after we signed the contract, the federal government saying, oh, we don't want Johnson logging in there, says no more logging in the national forest. Would you have a taking statute against the government? It doesn't strike me that the kind of targeting present in this case, and in United Nuclear, and in Scenic Gardens would be present in that case. They are fully aware that you are intending to do logging, and they knew that I did a little bit of logging, and they were okay with that. But they were afraid you were going to do a degree of logging that was really going to interfere with the use of the forest for other purposes, including tourism and remaining a natural habitat for animals.  Because a subjective motivation to target a particular contract for nullification. But doesn't regulation all the time, the government regulates those things, usually because it has a motivation to try to restrict particular activities. But then it regards us as bad. And if it's doing that restricting on property that it has complete sovereignty over, then why is that a taking? Your Honor, this is... As it does in the case of the national forest. Well, Your Honor, I think the national forest example, as you posited, could well be a taking. If there were the kind of evidence in that case, that the relevant government actors had a subjective motivation to nullify that contract. They're not trying to nullify the contract. They're simply trying to say that you're not going to be able to exploit the contract in the way that you would like. How does that differ from Caldwin-Cattle? Well, Your Honor, the case you've posited is much more like United Nuclear than Caldwin-Cattle. Caldwin-Cattle was a self-inflicted injury. The plaintiff didn't pay for his grazing lease and the government properly revoked it. End of story. Everything else, anything else flowed from that. The Court of Appeals holds specifically that the government did not interfere with his ability to get water. The government, in fact, actively prevented the subsequent grazing lessee from taking water. Now, why is this like United Nuclear? It's like United Nuclear because subjective motivation matters. That's exactly what was at issue between the majority and the dissent in United Nuclear. The United Nuclear majority held that because the government intended to collaborate with the Indian tribe to extract additional money, and as the Court puts it, from a party with whom it had a valid contract. So the contract is what was taken in that case. That's why there was a taking. The dissent said, and I want to be careful here to quote it specifically because the dissent raised the argument I think Your Honor may be making, but lost. The dissent said the particular purpose of the governmental action is not of legal import. Not of legal import. The dissent said, hey, they've stated a purpose to enhance tribal self-determination. That's good enough. We're not going to look behind that at the actual motivation of the actors. So there are, I mean, suppose, for example, let me give you another example. Just any form of regulation. Suppose you are employing people at a very low wage, and the government decides, and you have a contract to provide certain services, a construction contract, and you're relying on the fact that you can get employees for cheap. The government specifically says, we don't like this contractor paying low wages, and therefore we're going to increase the minimum wage. Your contract ends up being worth nothing to you as a result of that because the government has increased the minimum wage with you very much in mind. Taking? No, Your Honor, and because they may have, but they didn't. And they've taken all the value of your contract away from you. Correct, Your Honor, but through a public and generally applicable regulation, they've hit many others. And the distinction here is the wildlife refugee. Suppose you were the only one paying below the minimum wage at that point, and they raised the minimum wage to that point. If the purpose and effect of the government's action is to target a particular contract for nullification, and that's the result, then there's a taking. That's the holding in United Nuclear. That's what happened here, and that's why the court should find a taking. Your Honor, I do want to make one thing clear about the distinction between commercial fishing and commercial fishing activity, and it harkens back to where I started and where Judge Moore started us today. President Bush's proclamation contains very similar language, prohibiting commercial fishing within the mind of employers. There's no discussion at all of commercial fishing activity. So those words have a special significance in the factual context here where the Department of Interior, from the secretary on down, knew full well that plaintiffs had a contract, and to make any commercially viable use of the contract, they needed to engage in commercial fishing activity in the refuge water. The secretary of the Interior specifically said, we're going to protect the refuge waters from commercial fishing activity. The structure and form of that regulation, given that context, establishes the targeting necessary to get us out of Omnia to make this not a frustration by a public and general government act,  Thank you. No reserved full rebuttal time. Thank you, Your Honor. May it please the court. We respectfully request that this court affirm the decision that the court of federal claims that Holmeyer has not asserted a cognizable property interest. I want to ask you about footnote 3. Yes. Is your position that the regulation does not, as the footnote appears to state, the regulation does not bar the commercial fishing vessels from traversing the waters that are otherwise covered by the regulation? The issue was not developed below. But you've taken a position, if I understand it correctly. Is that the position of the government? You're willing to be bound to that? Not to the extent that it means what the secretary of the Interior might specifically do. I was just pointing out that the plain language of the regulation does not appear to bar fishing vessels. So this isn't language that represents the government's position. It represents what? It represents the government's position with respect to the plain language of the regulation, but not necessarily how the agency plans to enforce the regulation with respect to commercial fishing vessels. In other words, you're not saying in this footnote that the regulation does not apply to the traversing of the water by commercial fishing vessels? Correct, because that is not clear at this time. But in any event, our position remains the same because the issue is that the environment... Shouldn't you have a footnote like that in the brief if you're not going to stand behind it? I mean, to say that the plain language doesn't apply, but the secretary of the Interior might take a different position gives us... What comfort does that give us? We merely wanted to point out the nature of the language of the regulation because it was unclear from the complaints and from the briefing of the other side what was actually being prohibited. In any event... Well, what is actually being prohibited under the regulation? What is being prohibited is commercial fishing and commercial fishing activities. Even if one interprets that to mean that the Palmyra companies cannot use the dock for onloading and offloading as counsel represented, they never have to... I need to know what the government's position is on this. It's a question of law and you should be prepared to answer that. And I do not know the answer with respect to that question. I know that the government has sovereign rights over the water and therefore Palmyra... You don't have an answer. You have a regulation. It's got language. You're an attorney. You can't tell us what the meaning of that language is? How are other people... If the government who wrote the regulation can't tell us the meaning of the language, how is anybody supposed to know what's prohibited activity and what's not? Because that was not... We do not understand that that to be an issue in this case. That's why that issue is not developed. Well, what is the issue in this case? Assuming that Palmyra is not permitted to do what it claims it would like to do, that was the issue that was presented. Does that constitute a taking? And it does not constitute a taking because what they are describing is activity that would occur in the water. The United States has sovereignty over the water and therefore the licensor could never have given Palmyra any rights to do anything in the water. Well, let's take it one step at a time. Palmyra cannot fish within the 12-mile limit on the island. Is that correct? Yes. Can they drive through the 12-mile limit their boat to the dock on the island and offload it? I'm not prepared to say conclusively that they can. But you do say, I take it from your earlier statement, that the government could prohibit them from crossing the 12-mile limit on commercial fishing. Yes. Are there any other boat islands? Yes. You mean this language, commercial fishing activity, in your view, can be interpreted to include the prohibition of fishing vehicles simply driving through the water? The question I was answering was that because the United States has sovereignty, it could prohibit. She's answering your question. They might enact another regulation. Well, this regulation might be interpreted to reach that broadly, if I understand what you're saying. In other words, you're saying accepting arguendo the broadest construction of the regulation, which is the construction that Mr. Johnson was suggesting, that nonetheless there's no taking of that. Yes. All right. What about an easement of necessity, let's say, for crossing through a territory, which is admittedly a territory that the government has sovereign rights in, but in order to enjoy the use of the property as to which there is a right on the land, there is an easement of necessity. Do you recognize the possibility of there being an easement of necessity in a case such as this one? Unfortunately, I have not looked into that issue. It seems, though, that if the use of the easement would impinge upon the wildlife, the purpose for which the wildlife refuge was established, then it seems it could be prohibited as well. We have a case from the Court of Claims. It's authority for us that deals with tourist camps in national forest areas in which we've held that there is an easement of necessity, even though it might interfere with what the government regarded as the need for a pristine environment for the wilderness. That's the Glyden case. Are you familiar with that? I'm not familiar with that case. But even under common law, you probably know that if you have a piece of property which is isolated by another property, there could be an easement of access to that landlocked property. Certainly. Why wouldn't the situation be the same here, where they could drive their boat over the property and reach the dock? Well, for instance, it's not clear that the only way to reach the island would be by traversing the waters. As I mentioned in your briefs, other fishing vessels may use their vessels to get to where they can offload or they may airship. So it's possible that they could use a plane or a helicopter to get from their air vessel, which is outside of the zone, to the island. So that's why it's not clear to me necessarily that they need an easement which would permit them to drive fishing vessels through this protected wildlife refuge. Well, landlocked land could also be accessed via helicopter, but usually extreme measures are not considered satisfying in order to avoid the easement in that situation. I'm not sure what the question is. Well, you're saying you're not sure an easement is at all necessary because they could take a helicopter. Because, you know, fishing boats so often have helipads on them. So the position is no easement because it's technically feasible that they could have a helicopter? No, I just raised that as an issue. As the court knows, the question of an easement was not raised below or in the brief, so I'm not prepared to set forth the government's position with respect to whether an easement is indeed required or whether we have an argument behind it would not be required. The term easement wasn't used, but I take it that the argument about the fact that prohibition, if there is one, of crossing the 12-mile area is a taking of property, is in effect saying that you've taken an easement. There are two easements, perhaps. The first easement to cross and the second easement to use the water adjacent to the land to unload. Well, actually, the issue as presented both below in the briefing was whether that took the contractual rights to actually exercise the license. And none of those contractual rights were taken because Palmyra could still use the harbor and the dock and the airstrip. They never had the right to do anything in the water, and therefore, although— Wait, they can still use the dock, the airstrip, and the harbor, but the dock is, as I understand it, in the water. Well, they can't—they do not have the—they never had the right to do anything in the water, to the extent that the dock is below—is not on the emergent land, although the license specifically gives them the right to use— I've never heard someone call a dock something that exists on still some land. It seems to me that it always extends over the water. You're saying that, arguably, there's no entitlement to use that. If it is true that the dock is not on the emergent land, then it could not have been conveyed via the license, and therefore, they never had that right, and to the extent that the government is limiting that, the ability to use the dock or anything in the water, they are not impinging upon the contractual rights. Now, do you think that this is—you've referred to it as a licensing rule. There's some confusion, at least in my mind, as to whether this is a license or a lease. What is your view on that? Mr. Johnson, next, please. I think, in any event, there's still not a taking. It doesn't seem that— No, but the first question is, what is the nature of the property interested? That may well be affected by how we categorize the particular property. Okay. I believe, however, the property interest they are pointing to, the one that they believe was taken, was, as Mr. Johnson just stated, the right to get fish to market more profitably. That is neither a lease nor a license. And they have not pointed to what is actually in the contracts that has been taken. That's why, whether that's characterized as a lease or as a license, does not appear to be determinative of whether there was a taking or not. Now, I will note, however, that because the uses— the license gave them the right to use certain parts of the emergent land for certain purposes, that does not appear to have the character of a lease because it is so limited. And others could use these, it appears, could use some of these same parts of the emergent land for other purposes. Mr.— The emergent land itself is where the dock is located? I'm not sure whether— Can we assume that? Yes. What good is the dock if you cannot use it by reaching it by boat? What is it, just a structure it can be used for storage or otherwise? I don't quite understand what the purpose of the dock would be, but for the fact that you can use it to reach it by boat, how can you let it go? Well, the dock may have no purpose other than that, but because they had no right to use the water and they had no contractual right to traverse the water, the fact that the dock, which they had hoped to use for a given purpose, now is not useful for that purpose does not make it a taking. They had no property interest in that. And for that reason, this— What property interest are you talking about? In the dock itself? In using the dock for the specific purpose they wanted to use it for. Did Mr. Johnson refer to the discussion of something like the United Nuclear case? Would you care to comment on why you think if you do the United Nuclear, this is the analysis of the United Nuclear, it's not a property interest? Certainly. Pallmeyer sidesteps the property interest issue by pointing to this idea of contractual nullification, stating that in this case, as in Seneca Gardens in United Nuclear, the government has nullified their contractual rights. This is false. In United Nuclear, the issue was that the governmental action directly affected the contractual right, that is, the right to have this plan approved with approval of the secretary. Here, the actual contractual rights have not been affected at all. On that point, Pallmeyer alleges that the court below said that because the government did not step into the shoes of Pallmeyer, that's what made it not a taking. That's actually not the case. The court specifically said that the designation of the, and this is at page 233, the designation of the Pallmeyer National Wildlife Refuge and subsequent closure of the refuge to commercial fishing neither appropriated plaintiff's contract rights for public use nor removed plaintiff's right to enforce their contractual licenses or seek a contractual remedy with their licensors. And that's the difference with United Nuclear, where the government action actually affected the contractual rights. Here, Pallmeyer still has the same rights to enforce its contract against the licensor, which is now the Nature Conservancy. And that's why this is not a case of nullification. It seems that Pallmeyer is aware that they cannot show direct nullification or abrogation of their contractual rights, and so they point to the idea that, well, this particular contract was targeted, and everyone knew that Pallmeyer was the only entity that had such a contract. But the case law does not support the idea that because a particular contract or contractor was in mind or there was a subjective motivation, that that constitutes contractual nullification. You have to look at the nature of the government action itself. Did it nullify the contract? Not, did it set up a situation where the contract was no longer valuable? Again, I point to how Pallmeyer itself characterizes the property interest that was taken, that is, the right to get fish to market more profitably. It's only meaningful if everyone has the right to fish. Then, certainly, the rights that they were granted by the licensor, they have a commercial advantage over others. But if nobody has a right to fish and nobody has a right to have vessels in the water, then this very same contractual rights mean that they're not getting fish to market more profitably. But that is not a government action on the actual contractual rights that they have. Even though they might be the only ones who have fishing rights and the ability to have a manuscript for fishing purposes or fishing purposes and nobody else has either? Yes, because of the license. So it's not even a targeted nullification at that point? No, it's not. It may have been targeted in that perhaps they were in mind, but it's not a nullification because they still have the same contractual rights. The contractual rights were not abrogated or limited in any way. I don't understand that part, though. I mean, I have a right to use a patch of land, but for national security reasons or otherwise, the government sets up a perimeter around the land and I'm not permitted to cross. How do I then have a contractual right to use the land if the government has made it clear that there's no way I can get to it? How is it not a nullification of the contract under those circumstances? I understand you might still argue it's not a taking or it's not compensable or something, but how is it not a nullification of the contract? Because you still have the right to use the land. How? The government has taken away my right to get to the land, so it's impossible for me to use it. Well, as we discussed, the government has not necessarily taken away their right to get to the land. Perhaps it's a way to get to the land that they don't find profitable or is not feasible, but there is no question that they can somehow get to the land. No, by nullification. Or by any other means. If there is an easement, perhaps that's the means. So there's nullification if there's no way to get to the land, and we can see that there is not nullification if there's some other means to get to it. It still doesn't seem that there would be nullification, because the only right that the licensor can grant is the actual right to use the land. If you need a way to get to the land, the licensor could not give you that. And in fact, in this particular set of licenses, the licensor made clear that there may be other approvals and permits you may need to exercise the rights that we are giving you. And that is not our concern, and that is completely your concern. And if the government acts in such a way that limits that, you have certain rights under the contract. So it seems this is not a case where, for instance, in Standing the Gardens, it discusses the Windstar cases and this idea of this unqualified contractual right. This was not an unqualified contractual right. Their rights were already limited by what the government can do in its sovereign power over the water. So if there are no further questions, we continue to assert that the homeowner has not asserted a recognizable property interest that has actually been affected by the government action, and therefore cannot assert a value to this claim. Thank you. Johnson will give you what we're about to have, which I think is pretty intense. Thank you, Your Honor. One of the points opposing counsel made is quite telling. Her hypothetical is, if no one has the right to fish, then the contract would be equally worthless, so there couldn't have been a taking. Your Honor, that's just not what happened here. The government did not enact public and general regulations limiting fishing in the EEZ or anywhere else. True, the 12 miles were applied, but that's not the nature of the taking. Plaintiffs have, and have always had, the same right to fish in the EEZ as everyone else. The government didn't disturb those rights. Plaintiffs have never alleged that they did, and there seems to be a lot of confusion in this case, in a couple instances in the trial court's opinion, and in several of the government's briefs, as to whether the property interest at issue is a right to fish. It's not. It's the contract, which is functionally, as we say, a lease, that had the purpose of allowing plaintiffs to use that island and the facilities on it to get fish to market more cheaply, more efficiently, and more profitably. Just to be clear, where is it that you want to fish? Anywhere in that part of the ocean. Other than the 12-mile EEZ? Correct. You're perfectly happy not to fish there. You're not arguing that that was any form of taking? Correct. The government has the power to regulate fishing and to establish wildlife refuges. But when it's targeted... Wait a minute. Let's make sure we... Do you... To reiterate, just one question. Do you have any problem, that is to say, do you think there's any ingredient of failure, in the government's saying, no fishing in the 12 miles? You can cross, you can run your fishery on the island and so forth, but no fishing in the 12 miles? If it were only no fishing in the 12 miles, we wouldn't be here today. The problem is... Do you think as a matter of legal analysis, proper legal analysis, that would not be a take-away? Most likely, Your Honor, and I hate to equivocate, but I have to, because you have to look at the Penn Central factors. One could imagine that all the valuable fish were within the 12 miles. Yeah, but you don't get to all the mushy factors. You have to deal with the hard factor, which is the property. And the property interest would still be in the contracts. And if it were still targeted at nullifying the contract, because everybody knew the contract was directed towards fishing a particular species that only resides within the 12 miles, I think it's unlikely. So let me ask you this question. Suppose the contract were framed in a way that your client got and got only the right to fish within 12 miles. And then the government did what it otherwise would be completely free, which is to say no fishing in 12 miles. So that completely took all of the rights that your contract gave, because your contract was so narrowly circumscribed. Is that a take-away? Your Honor, that sounds like American collagen. And the right to fish is not a property interest. We agree with that. But does that take your contract to fish and operate a fishery with fish coming from the 12-mile area? I think it probably would, and let me explain why. If the contract was you can fish in the 12 miles and you can use the facilities on the island to get the fish to market, then the government did exactly what it did here. It said no fishing in the 12 miles and no ability to get fish from your fishery to market. Just the no fishing in the 12 miles. If it was targeted as it was here, then I think it would be a take-away, Your Honor. So what you've got is a system. This is what strikes me as so fundamentally peculiar about this analysis is that a part of the original owners of the land presumably could fish whatever they want and do whatever they want with the land and so forth, so that if, as to them, the government said no fishing in the 12 miles, not a take-away. It's not an interference with any right that they have in the land. But if they have a contract with somebody else, an entirely private contract, in which they narrow the interest of that other party so specifically to something that the government is going to want to regulate, then they've created a property interest in that other party that they themselves didn't originally have and that that property interest can be taken by the regulation. How can two private parties create a property interest vis-a-vis the government that the first party didn't have in the first place? Well, Your Honor, first of all, that's... I do understand your question. It's not the habit here. Humor. Tell me why that makes sense. Well, Your Honor, because the takings analysis is governed by the property interest that the plaintiff has, not any property interest that one could conceive of as relating to or preceding the property. As Your Honor pointed out, a life estate is a property interest. It could be taken in a way that would have no effect on the fee-symbol owner. And so a fee-symbol owner can, by creating a life estate or a tenancy, create a property interest that the government could take. They previously had it, though. The fee-symbol owner had that. And if, for example, the fee-symbol owner were told the government's going to take this property for the lifetime of Johnson, then that's a temporary taking, just as it would be if they conveyed the property to you for the lifetime. Absolutely, Your Honor. And if, instead of it being plaintiffs here whose property interest was limited only to the contract... For example, let's say the contract had never been written and the owners of the island fee-symbol had been operating their own commercial enterprise. Then it would be in a non-categorical takings context. We'd have to apply the Penn Central factors. There is a doctrinal difference between takings that nullify an entire property interest, which is what happened here, and takings that affect a broader property interest. That's Penn Central. And what we expect is this, a total categorical taking that prevents you from doing what? Prevents you from fishing in the waters? Prevents you from carrying out a fishing operation on the land? It nullified the entire value of the contract. But it made it more expensive. Could you, for instance, fish outside of the colonial mile, transfer the fish to an amphibian plane and land it on the island? Would that be restricted? I don't know, Your Honor. But I know that that would destroy the entire economic value of the contract, and so it would... No, no. Wait, wait, wait. Would you be restricted from doing that under the regulations? I don't know whether the government would consider overflight by an amphibian vessel transferring catch from a boat to the base camp to be commercial fishing activity within the refuge. So I wish I could answer Your Honor's question, but I just can't. Would that be a commercial fishing activity within the refuge? Or would it be outside of the refuge? You would not be touching the 12-mile limit? You'd be able to find it. And I just don't know whether, because it's... With great respect, Your Honor, it's not an economically viable solution to resurrect this contract, to think that somehow plaintiffs could fish and then helicopter the catch from the boats to the base camp. And so one could think about cases such as the one Judge Bryson cited, and I think there's another one called Cosby, that delineate where the overflight, the public navigational right... Where the plaintiff can feel like the check is part of Mr. Cosby's file. Right. And so I just don't know factually whether flights at the level that could conceivably make it practical to get fish from a boat to a base camp would be within the navigational servitude or not. Again, I understand Your Honor's point, but to the extent that counsel or the court thinks that overflight rights are relevant here, respectfully, plaintiffs disagree fundamentally and it would present a question of fact. It is just so economically unviable to use a helicopter every day to get fish and fish... We're talking about a cargo helicopter here making multiple trips. Fish are heavy and there's a lot of them. So it's just not the solution here. A lot of them might be economically way to do it. So let's not go to that point. The other rebuttal point, Your Honor, and I am beyond my time, and I respect the court's indulgence. Counsel says subjective motivation is not sufficient and not relevant, and that is just not correct, Your Honors. United Nuclear analyzed the subjective motivation of the government actors. Scandia Gardens specifically states that the statute directly and intentionally abrogated the contracts. If subjective motivation were irrelevant, they wouldn't have bothered mentioning that it was intentional. Huntley recognizes that the purpose of the government action can be determinative, and Kearney and Strecker says the same thing. In that case, the consequences were unintended, therefore no taking. So those cases all establish that the subjective intentions are appropriate. I should note that the statute that the government cited to the trial court, the National Wildlife Refuge System Administration Act, it has provisions in it that state activities that are not specifically permitted are prohibited. There are some exceptions to that, but unloading and offloading fish from the water to the dock is not among the exceptions. It's not among them, and so by default, when Secretary Babbitt drafted this regulation, he presumably knew the meats and bounds of that statute, the regulations promulgated there under it. He knew that the commercial fishing activity that plaintiffs needed to engage in would be prohibited unless it was specifically permitted. They didn't. That action was taken with full knowledge and intent and had the purpose and effect of nullifying the contract that issued in this case, Your Honors. It was a take. Thank you.